IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. DEREK DEXTER SHOULDERBLADE, Defendant. | CR 17–135–BLG–DLC<br><br>ORDER |

Before the Court is Defendant Derek Dexter Shoulderblade's ("Shoulderblade") Motion to Suppress (Doc. 16). Shoulderblade moves the Court to suppress inculpatory statements he provided during a custodial interview held on September 19, 2017, based upon his assertion that the interviewing agents ignored his invocation of his right to remain silent and continued the interview in violation of this right. (*Id.* at 2.) The Government opposes this Motion. (Doc. 22.) For the following reasons, the Motion will be granted.

## FACTUAL BACKGROUND

Shouldberblade has been charged with second degree murder in violation of 18 U.S.C. §§ 1153(a), 111. (Doc. 3 at 1–2.) On September 19, 2017,

Shoulderblade returned a phone call to Bureau of Indian Affairs Special Agent John Dodd ("Dodd") which resulted in Shoulderblade reporting to the police station in Lame Deer, Montana, for a "conversation" with Dodd and Federal Bureau of Investigations Special Agent Aaron Christensen ("Christensen"). (Doc. 19 at 2–3.) Because there was a warrant for Shoulderblade's arrest, the Agents informed Shoulderblade that he was in custody and, "out of an overabundance of caution," explained his rights and presented him with an Advice of Rights Form. (*Id.* at 3–8.) The Advice of Rights form was described as "a formality" which the Agents needed Shoulderblade to sign if he was willing to tell the Agents his "side of the story." (*Id.* at 7.) Shoulderblade then waived his rights by signing the form and was interrogated for nearly an hour and a half.

The Agents began by talking to Shoulderblade about his MMA fighting, his age, family, life, regrets, faith, and honesty. (*Id.* at 8–19.) Shoulderblade then began to tell his story concerning the night in question. (*Id.* at 19–37.) The Agents then told Shoulderblade that they believed he was "leaving some stuff out." (*Id.* at 37.) Shoulderblade attempted to clarify and continued his story until the Agents pointed out that his story was inconsistent. (*Id.* at 37–48.) The Agents then detailed what effect inconsistencies could have on later prosecution of Shoulderblade's case, told him that they were going to "start over," and expressed their understanding of the circumstances which could induce someone to commit a

crime before stating that they didn't think he "meant to kill him." (*Id.* at 48–53.) When Shoulderblade asked the Agents what they meant, they drew his attention to a video camera near the scene of the crime and told him to "think about the implication of the fact that there's a video camera . . . [a]nd consider that Agent Dodd has already told you we don't like to ask questions that we don't know the answer to." (*Id.* at 53.)

When Shoulderblade stated that he wanted to see the video, the Agents told him that they did not have the video. (*Id.* at 53–54.) The Agents then asked Shoulderblade if the video was going to implicate him and whether he and the victim had an altercation on the night in question. (*Id.* at 54.) Shoulderblade replied no. (*Id.*)

At this point, the Agents confronted Shoulderblade with some of the inconsistencies in his statement and the following exchange took place:

> SA DODD: But right now is not a time to protect other people, right now is the time to be honest. Because like I say, right now, you know, you're in a good place right now. Okay? But when you start lying to us, you're not in a good place, dude. Okay?
> DEREK SHOULDERBLADE: Mm-hmm.
> SA DODD: Okay. So let's start over from – let's just forget about this and let's start over from the beginning. We don't need to do any more maps, we think we know, but let's start over from the beginning that – that night. Okay? So let me start asking you some questions then, okay?
> DEREK SHOULDERBLADE: *No, I don't want to answer any further questions until I see video.*
> SA DODD: Well, we don't have the video either. That's what we

-3-

>were trying to tell – we were –
>DEREK SHOULDERBLADE: So are you guys just –
>SA DODD: – we were asking you –
>DEREK SHOULDERBLADE: – you guys are just kind of –
>SA DODD: No, no, no, what we're saying –
>DEREK SHOULDERBLADE: – putting – you guys are just kind of –
>
>SA CHRISTENSEN: What we're telling you is that we don't know what the video shows, but you do.
>SA DODD: Yeah.
>SA CHRISTENSEN: And so once we see this thing, the first question we're going to ask ourselves is, was Derek being honest with us. *And we got other questions for you.* But, for example, why is it the people at the house were telling us that you got upset. Somebody said, hey, why don't you C-walk out of here, but you never mentioned that. It sounded like you got pretty pissed off.

(*Id.* at 55–56 (emphasis added).) Shoulderblade replied, the interrogation continued, and Shoulderblade made several incriminating statements.

## DISCUSSION

The landmark case *Miranda v. Arizona* established safeguards to be afforded to criminal suspects in order to ensure that law enforcement observe certain "basic" and "precious" rights "enshrined in our Constitution." 384 U.S. 436, 442 (1966). Among these precious rights are the Fifth Amendment's guarantee that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Court in *Miranda* was concerned with "the temptation for law enforcement officers, operating with little or no supervision over their investigative actions, to overbear the will of a defendant in

an isolated custodial interrogation setting." *Sessoms v. Grounds*, 776 F.3d 615, 621 (9th Cir. 2015) (citing *Miranda*, 384 U.S. at 461). The Court noted that the "very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Miranda*, 384 U.S. at 455.

"To ensure that the use of such psychological tactics to exploit a suspect's vulnerabilities do not run afoul of the Fifth Amendment, *Miranda* set a clear bright-line rule: 'Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Sessoms*, 776 F.3d at 622 (quoting *Miranda*, 384 U.S. at 444). Once a person invokes the right to remain silent, all questioning must cease:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

*Miranda*, 384 U.S. at 473–74.

However, when invoking the protections of the Fifth Amendment, "a suspect must do so 'unambiguously,'" meaning that "'ambiguous or equivocal'" invocations will not require law enforcement to end the interrogation, "or ask questions to clarify whether the accused wants to invoke his or her *Miranda*

rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (quoting *Davis v. United States*, 512 U.S. 452, 459, 461–62 (1994)). Allowing an "ambiguous act, omission, or statement" to end an interrogation would require police to "make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Id.* at 382 (quoting *Davis*, 512 U.S. at 461). The requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers on how to proceed in the face of ambiguity." *Id.* at 381–82 (quoting *Davis*, 512 U.S. at 458–59).

Here, Shoulderblade claims that he "unambiguously invoked his Fifth Amendment right to remain silent and the officers, therefore, were required to cease questioning." (Doc. 17 at 12.) Shoulderblade avers that his statement "that he did not want to answer any questions until he could see the video would be understood by ordinary people to mean that he no longer wanted the officers to question him until his condition precedent—that of seeing the video with the officers—was met." (*Id.*) Shoulderblade further argues that the Agents' comments after the invocation show that they subjectively understood his statement as an unambiguous refusal. (*Id.* at 12–13 (citing *Hurd v. Terhune*, 619 F.3d 1080, 1089 (9th Cir. 2010).)

The Government counters by arguing that the condition itself made

-6-

Shoulderblade's invocation ambiguous, Shoulderblade continued to talk after his invocation which made his invocation unclear, and that his questions prior to invoking his rights made the invocation ambiguous. The Court addresses these arguments in reverse order.

I.   **Pre-Invocation Questions**

The Government argues that because Shoulderblade had asked questions prior to his invocation aimed at discovering what the Agents knew about certain subjects, his invocation was ambiguous. (Doc. 22 at 21–22.) The Government claims that Shoulderblade was "bargaining for information" and his request to see the video was "substantively no different." (Id. at 21–22.)

The Court agrees with the Government that when Shoulderblade asked "why [his] name got brought up," "why [he is] here today," and "what attracted [the Agents] to [him]," Shoulderblade was trying to figure out "what the officers knew." (Id. at 21–22.) However, the Court does not agree that Shoulderblade's statement "[n]o, I don't want to answer any further questions until I see video," is "substantively no different" than his prior questions, or ambiguous in light of those questions. While the prior were questions, the latter is a statement. More importantly, the latter is a statement invoking Shoulderblade's right to remain silent, which the Court finds to be substantively different. It is irrelevant that Shoulderblade decided that he did not want to talk at that moment in the interview

-7-

after talking for some time and seeing the lay of the land, as it were. *Miranda* provides that "if [an] individual indicates in any manner, *at any time prior to or during questioning*, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473–74 (emphasis added).

Further, Shoulderblade's statement is not ambiguous merely because he had previously asked questions concerning what the Agents knew about him or because it indicates that he wanted to know what the video would show. To determine whether a request is "ambiguous or equivocal,"

> [T]he court must apply an objective inquiry: "although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."

*Garcia v. Long*, 808 F.3d 771, 778 (9th Cir. 2015) (quoting *Davis*, 512 U.S. at 459).[1] Objectively, it is clear that Shoulderblade didn't want to talk until he saw the video because he didn't want to become a witness against himself. However, his reason does not make his invocation ambiguous. While a reasonable police officer in the circumstances might begrudge Shoulderblade's invocation, the Court is not convinced a reasonable officer would misunderstand the meaning of "I don't

---

[1] Although this statement regards the right to counsel, "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*. . . . Both protect the privilege against compulsory self-incrimination." *Berghuis*, 560 U.S. at 381–82 (internal citations omitted).

want to answer further questions."

The Court is convinced that the Government's contention that Shoulderblade's prior questions make his statement ambiguous emasculates the protections of the Fifth Amendment. The "term 'Fifth Amendment' in the context of our time is commonly regarded as being synonymous with the privilege against self-incrimination." *Anderson v. Terhune*, 516 F.3d 781, 783 (9th Cir. 2008 (quoting *Quinn v. United States*, 349 U.S. 155, 163 (1955)). To allow *questions aimed at avoiding* self-incrimination to render invalid a *statement uttered to invoke* the privilege against self-incrimination would undermine the protections of the Fifth Amendment. It is beyond question that Shoulderblade wanted to know whether the video incriminated him. What suspect wouldn't want to know this information? However, Shoulderblade has a right not to be compelled into being "a witness against himself." U.S. Const. amend. V. Shoulderblade effectively invoked this right in an unequivocal statement so as to avoid becoming a witness against himself. His intent in invoking this right, far from rendering his invocation ambiguous, is precisely the intent protected by the Fifth Amendment.[2]

---

[2] The Government further states, without detailed analysis, that Shoulderblade's "case is also in contrast" to this Court's decision in *United States v. Lahmer*, No. CR 16–27–M–DLC, Doc. 80 at 9 (Nov. 1, 2016). (Doc. 22 at 22.) The Government's statement amounts to an argument that because the "totality of the circumstances" in a different case resulted in a finding of an unambiguous invocation, the totality of the circumstances in this case should result in a different conclusion. Counsel's failure to analyze the differences between these two cases renders this general argument unpersuasive.

## II. Subsequent Responses

The Government contends that because Shoulderblade continued answering the Agents' questions after he attempted to invoke his right to remain silent, he was "not asserting his right to remain silent." (Id. at 20–21.) The Government cites to *United States v. Shi*, 525 F.3d 709, 729–30 (9th Cir. 2008), to support its contention that Shoulderblade's continued responsiveness obviates the invocation of his rights. (Doc. 22 at 20.)

The Government's argument overlooks both United States Supreme Court and Ninth Circuit precedent. In *Smith v. Illinois*, 469 U.S. 91, 94–100 (1984), the Court held that "under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." *Id.* at 100. The Ninth Circuit in *Jones v. Harrington*, 829 F.3d 1128, 1140 (9th Cir. 2016) (quoting *Smith*, 469 U.S. at 98–99), recognized that *Smith* "clearly established" that "when determining whether the invocation of a constitutional right is ambiguous, . . . [courts cannot] look to post-invocation statements to 'cast retrospective doubt on the clarity of [the] initial request itself.'" The court emphasized that "[e]ven one question [is] one question too many. When an 'individual indicates *in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation*

-10-

*must cease.*'" *Id.* at 1141 (quoting *Miranda*, 384 U.S. at 473–74) (emphasis in original). Further, the court stated that

> Relying on the fact that it was the defendant, not the interrogators, who continued the discussion, ignores the bedrock principle that the interrogators should have stopped all questioning. A statement taken after the suspect invoked his right to remain silent cannot be other than the product of compulsion, subtle or otherwise.

*Id.* (internal quotation marks and citations omitted). Here, there has been no argument that Shoulderblade waived his rights after invoking them and no evidence would support such an assertion. Accordingly, the Court will not permit Shoulderblade's post-invocation responses to continued questioning by the Agents to cast "retrospective doubt" upon his initial invocation.

While the Ninth Circuit's decision in *Shi* appears to stand in complete opposition to the court's later decision in *Jones*, the Court believes the two are distinguishable. In *Shi*, the accused was charged with pirating a ship and murdering the captain and first mate, he was taken into custody, waived his rights, and was interrogated for four and a half hours. At some point during the interrogation, Shi stated that he didn't "want to talk about the accident." At this point, the interrogator reminded Shi of the waiver and also that he "had the right to stop talking at any time" and Shi again started talking. *Shi*, 525 F.3d at 729–30. Because Shi was charged with piracy and murder, his statement that he didn't "want to talk about the accident" would not "have caused a reasonable officer in

-11-

the circumstances" to understand that Shi was invoking his right to remain silent. Shi did not say he didn't want to answer any more questions, he only stated that he didn't "want to talk about the accident." However, the interrogator attempted to clarify by reminding Shi of his waiver and his right to stop talking and Shi decided to keep talking. *Id.* at 729–30. Here, in contrast, Shoulderblade expressly stated that he didn't "want to answer any further questions" and the Agents did not stop questioning or remind him that he could stop talking at any time. Instead, the Agents proceeded undeterred with more questions. The Court is convinced that *Shi* is distinguishable from the present case and is not controlling in light of both *Smith* and *Jones*.

### III. Conditional Invocation

The Government contends that "the proposed condition that Shoulderblade asserted to not answer any questions until he saw the video makes his invocation itself ambiguous." (Doc. 22 at 18.) The Court cannot agree.

In *Smith v. Endell*, 860 F.2d 1528, 1531–34 (9th Cir. 1988), the Ninth Circuit addressed whether a suspect's conditional statement constituted an invocation of his right to counsel. During interrogation, Smith stated, "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" *Id.* at 1529. The Court characterized Smith's request as conditional because "it was not to be

operative unless the troopers suspected Smith of the murders; if they did, however, Smith wanted counsel. The troopers could not have mistaken Smith's meaning." *Id.* at 1531. Since the troopers "knew him to be a suspect, questioning should have stopped until an attorney was present, unless Smith himself initiated its renewal." *Id.* at 1532. Because the condition was satisfied, Smith had invoked his rights. The fact that an invocation is conditional does not mean that the invocation is ambiguous.

The Government further asserts that "[s]ince they could not and would not meet his condition, it was unclear whether he wanted to continue questioning—his request was therefore ambiguous," "his invocation of the right to remain silent was not operative," and "open to interpretation." (Doc. 22 at 20.) The Government's argument puts the cart in front of the horse. Shoulderblade stated "I don't want to answer any further questions until I see video." Unlike the invocation in *Smith*, which was not operative unless the condition was fulfilled, Shoulderblade's invocation was immediately operative unless his condition was fulfilled. The fact that the Agents "could not and would not" satisfy Shoulderblade's condition does not render it ambiguous, it meant that Shoulderblade had invoked his right to remain silent. The Court is satisfied that the only reason the Agents thought it was "unclear whether he wanted to continue questioning" was because they persisted in questioning Shoulderblade. Again,

-13-

the failure to satisfy Shoulderblade's condition did not render his invocation "not operative" or "open to interpretation," it rendered his invocation immediately effective.

Additionally, citing to *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003) overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003), and *United States v. Doe*, 60 F.3d 544, 546 (9th Cir. 1995), the Government contends that because Shoulderblade added "until I see the video" to his invocation, he qualified his invocation and made it ambiguous. (Doc. 22 at 18.) Comparing Shoulderblade's statement to the alleged invocations at issue in either *Clark* or *Doe* does not advance the Government's argument. Unlike the statement at issue in *Clark*, Shoulderblade's statement was not prefaced with "I think" and was not a question asking whether the Agents thought he should be talking. *See Clark*, 331 F.3d at 1065. And, unlike the question at issue in *Doe*, Shoulderblade's statement was not a procedural question akin to "[w]hat time will I see a lawyer?" *See Doe*, 170 F.3d at 1166. Consequently, the Court is satisfied that neither of these cases mandate the conclusion that Shoulderblade's statement was ambiguous.

After some previous difficulties in the interrogation, the Agents stated that they were going to "start over" and asked Shoulderblade if he would "let [them] start asking [him] some questions, then, okay?" Shoulderblade responded "[n]o, I don't want to answer any further questions until I see video." (Doc. 19 at 55.)

The Court is convinced that any reasonable officer in the circumstances would have recognized that Shoulderblade had unambiguously but conditionally invoked his right to remain silent and that the invocation was effective unless the condition was met. Since the Agents "could not and would not" meet Shoulderblade's condition, they were obligated to cease all questioning. The Agents' failure to comply with this constitutional mandate requires the suppression of all questions and answers occurring after Shoulderblade invoked his Fifth Amendment right.[3] As the Plea Agreement Deadline is currently set to expire today, the date of this Order, the Court will extend this deadline. (Doc. 13 at 1.) Also before the Court is Shoulderblade's Unopposed Motion to Continue Trial (Doc. 25). Because this Motion is based on the Motion to Suppress, which is being granted, the Motion to Continue will be denied. Accordingly,

IT IS ORDERED that Shoulderblade's Motion to Suppress (Doc. 16) is GRANTED.

IT IS FURTHER ORDERED that the Plea Agreement Deadline currently set for today, January 18, 2018, is extended until January 23, 2018.

IT IS FURTHER ORDERED that Shoulderblade's Unopposed Motion to Continue Trial (Doc. 25) is DENIED.

---

[3] Because the Court finds that once is enough, the Court refrains from addressing the parties' arguments as to the second and third instances where Shoulderblade allegedly invoked his rights.

DATED this 18th day of January, 2018.

*/s/ Dana L. Christensen*
Dana L. Christensen, Chief Judge
United States District Court